1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   ANITA ANN BLACKWELL,                          CASE NO. 1:10-cv-00918-SMS

10                          Plaintiff,

                                                 ORDER AFFIRMING AGENCY'S
11          v.                                    DENIAL OF BENEFITS AND ORDERING
                                                 JUDGMENT FOR COMMISSIONER
12   MICHAEL ASTRUE,
     Commissioner of Social Security,

13
                            Defendant.
14   _____/

15

16

17          Plaintiff Anita Ann Blackwell seeks judicial review of a final decision of the

18   Commissioner of Social Security ("Commissioner") denying her application for disability

19   insurance benefits under Title II, and for supplemental security income pursuant to Title XVI

20   of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is currently before the

21   Court on the parties' cross-briefs, which were submitted, without oral argument, to the

22   Honorable Sandra M. Snyder, United States Magistrate Judge.  Following a review of the

23   complete record and applicable law, this Court finds the decision of the Administrative Law

24   Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based on

25   proper legal standards.  Accordingly, this Court denies Plaintiff's appeal.

26   ///

27   ///

///

28

1

1  **I.**      **Administrative Record**

2        **A.**      **Procedural History**

3        In a 2002 hearing decision, Administrative Law Judge Michael Haubner denied Plaintiff's

4  application for disability benefits, finding that Plaintiff was able to perform her prior work as a

5  day care provider or mail clerk.

6        On November 4, 2005, Plaintiff protectively filed an application under both Title II and

7  Title XVI for a period of disability, disability insurance benefits, and  supplemental security

8  income (SSI), alleging a disability beginning August 14, 2004. The claims were denied initially

9  on June 19, 2006, and upon reconsideration on February 8, 2007.  Plaintiff requested a hearing

10 on March 8, 2007.

11       Plaintiff appeared and testified at a hearing on July 15, 2008.  In a decision dated

12 September 2, 2008, Administrative Law Judge Michael J. Kopicki denied Plaintiff's application.

13 On April 12, 2010, the Appeals Council declined Plaintiff's request for a review of the ALJ's

14 decision.  On May 20, 2010, Plaintiff filed her complaint in this Court.

15       **B.**      **Factual Record**

16       Plaintiff (born December 21, 1965) completed two years of business college, studying to

17 be an executive secretary.  She never worked in that field.  She worked longest as a school bus

18 driver, but appears to have stopped driving after a work-related accident in 1998 that injured her

19 knee and back.  Plaintiff testified that she had allowed her driver's license to expire, believing

20 that it was dangerous for her to drive since her knee sometimes "locked up."

21       From November 2007 through March 2008, Plaintiff did in-home service work, which

22 consisted of cooking, housework, laundry, and personal care of an individual with mental and

23 physical disabilities.  The county provided the compensation.   Although her employer provided

24 concessions, such as frequent rest breaks, he eventually discharged Plaintiff because she was

25 physically unable to perform the work completely and repeatedly dropped and broke things.

26       Plaintiff had previously received county compensation for performing the same work for

27 her invalid mother, from the time her mother had a major stroke in 2002 until she died in 2004.

28 Plaintiff required assistance in that job since she could neither lift her mother nor perform

personal care, such as caring for dressings.  Plaintiff blamed caring for her mother for her development of physical limitations.

In her hearing testimony, Plaintiff opined that she was most impaired by her back pain. Although she took Neurontin, Motrin, Soma, and Vicodin, these medications relieved her pain but did not eliminate it.  She had difficulty keeping track of her many medications and taking them on schedule.

In a third-party adult functioning report, Plaintiff's friend James Bell reported that she was easily confused and her mind wandered.  Plaintiff's nineteen-year-old daughter, LaQuinta Sellers, reported that Plaintiff did not know what day it is and had to be told when to take her medications.  Plaintiff's pain, said Sellers, made her forgetful.

Plaintiff estimated she could occasionally lift ten pounds.  She could walk about a half a mile or stand about one-half hour using a walker or cane.  Without a cane or walker, she was likely to fall.  When she sat, she needed to change position every fifteen minutes.

Plaintiff also complained of numbness in her feet.  She elevated her feet for about one-half hour three or four times daily.  She had lost muscle tone in her right arm as a result of her carpal tunnel syndrome.  Plaintiff also had asthma and insulin-dependent diabetes.  She was five foot, three inches, and weighed approximately 265 pounds.

Plaintiff reported that she was taking Aciphex (acid reflux disease), Actos (diabetes), Advair (asthma), Albuterol (asthma), Ambien (sleep), Benadryl (asthma), Glucophage (diabetes) Hydrochlorothiazide (water retention), Motrin (pain), Neurontin (pinched nerve), Paxil (depression), Soma (muscle relaxer), and Vicodin (pain).  Benadryl, Neurontin, and Paxil made her drowsy.

Because standing was difficult and her hands hurt, Plaintiff cooked only two or three times a month.  Instead, she warmed frozen meals in the microwave.

Plaintiff had little social life, preferring to be by herself.  Bell described her as crying by herself in her room.  Her hobbies included reading and watching television.  She went out only if her daughter accompanied her.  Most days she did not go outside at all.  She estimated that she went outside two or three times monthly.

She shopped twice a month, for three hours at a time, for groceries and personal supplies. Bell commented that Plaintiff enjoyed choosing her own food.  Plaintiff reported that she was able to pay bills, count change, handle a savings account, and use checks or money orders. Sellers disagreed, noting that Plaintiff was forgetful and confused.

Plaintiff depended on Sellers for assistance in personal care.  Sellers combed and washed Plaintiff's hair and shaved Plaintiff.  She woke Plaintiff in the morning, laid out her clothes, and managed her medications.

In April 2007, Plaintiff was living with a friend named Michelle, who accompanied her to an appointment with Dr. Mythili Sundaresan.  By the time of the hearing, Plaintiff had moved into  Sellers' one-bedroom apartment.  Sellers was a supermarket cashier.  Plaintiff supported herself on state disability insurance.

**Radiology reports.**  In an MRI report dated February 26, 1999, radiologist Michael P. Curran, M.D., identified mild degenerative changes in the patellar tendon of Plaintiff's right knee.  Curran also noted "low signal intensity stranding in the medial aspect of the intrapatellar fat pad . . . consistent with scarring from previous arthroscopy."  AR 232.  In a report dated April 8, 1999, Curran noted that an MRI of Plaintiff's lumbar spine revealed mild degenerative disc disease at L4-5 and L5 -S1.

On March 1, 2001, Cicely Roberts, M.D., evaluated Plaintiff's x-rays to assess her claims of bilateral knee pain.  Roberts saw no fracture or joint effusion in Plaintiff's left knee, and commented that the soft tissue planes were intact.  Her conclusion was "negative left knee."  If Roberts also evaluated x-rays of Plaintiff's right knee, these are not included in the record.

**Family Care Providers.**  Plaintiff provided progress notes from her primary care physicians, Family Care Providers Medical Group, from September 15, 2004, through October 24, 2007.[1]  In addition to treating Plaintiff for acute maladies such as bronchitis and vaginitis, the records reflect continued monitoring of prescriptions for allergies, depression, back pain, gastro-esophageal reflux disease, and arthritis.

---

[1]  The brief progress notes are largely illegible.  The signature of the treating physician is unidentifiable.

4

Cervical spine x-rays taken May 24, 2007, were unremarkable except for "minimal disc space narrowing at C4-5."  AR 351.  Lumbar spine x-rays taken on the same day showed "Mild degenerative changes."  AR 352.

In  2007, Plaintiff's primary care physician, David W. Cardona, M.D., referred Plaintiff to neurologist Mythili Sundaresan, M.D., for a consultation on her back pain.[2]  Sundaresan's evaluations were negative except for weakness in her grip.  Plaintiff had sensory findings consistent with peripheral neuropathy and carpal tunnel syndrome.  Because Plaintiff's blood work showed elevated ANA, Sundaresan recommended referral to a rheumatologist to evaluate the possibility of lupus.  He also suggested referral to a pain management specialist in light of Plaintiff's complaints that her pain medications did not help her.  Sundaresan described Plaintiff as "pathologically obese."

An MRI of Plaintiff's lower spine, performed June 25, 2007, revealed a small disc protrusion at L5-4 and a small disc bulge at L5-S1.

**Fresno Community Hospital.**  On July 19, 2006, Saavedra E. Jeffrey performed a deep venous ultrasound to determine whether Plaintiff's leg pain and swelling was the result of deep venous thrombosis.  Jeffrey found no evidence of thrombosis.

On August 12, 2006, Plaintiff went to the emergency room complaining of pain in her left chest.  Although physicians identified a small pulmonary nodule, they found no evidence of pulmonary embolism.  Plaintiff's lungs were clear.  She did not have pneumonia.  Her electrocardiogram was normal.

**Psychiatric Evaluation.**  Frank Wilson, Jr., M.D., performed a psychiatric evaluation on behalf of the agency.  Plaintiff told Wilson that, although she took Paxil, she no longer liked life.  She had no history of psychiatric treatment or hospitalization.  After brief testing, Wilson opined that Plaintiff demonstrated normal intellectual functioning.  He diagnosed:

| | |
|---|---|
| Axis I | Adjustment disorder with depression |
| | Possible alcohol abuse, episodically |

---

[2]  Plaintiff had previously seen Sundaresan for back pain in 2000.  Sundaresan had then identified Plaintiff as experiencing neuropathy, possibly due to glucose intolerance.  He stressed the importance of her being on a diet, losing weight, and exercising.

Axis II          None

Axis III         Knee injury, allegedly work-related injury

Axis IV          Stressors: Financial and interpersonal
Axis V           Global Assessment of Functioning: 69

AR 246.[3]

Wilson made the following observations on Plaintiff's ability to adapt to work:

Based upon the evaluation and observation throughout the interview, I believe that the patient is able to maintain attention and concentration and to carry out one or two step simple job instructions.

The patient is able to relate and interact with coworkers, supervisors and the general public.

The patient is able to carry out an extensive variety of technical and/or complex instructions.

AR 246.

Wilson added that Plaintiff was able to handle her own funds.

**Internal Medicine Evaluation.**   Internist Steven Stoltz, M.D., who performed the internal medicine evaluation for the agency, described Plaintiff as "an obese female in no distress." AR 249.  She reported for the examination using a four-wheeled walker and wearing a soft right knee brace and carpal tunnel braces on both hands.  When she walked to the examining room without her walker, she had a "very pronounced limp on the right." AR 251.

Plaintiff's range of motion was within normal limits for all movements of her neck, shoulders, elbows, wrists, hips, knees and ankles.  Her knees had no crepitus or patellar instability.  Stoltz diagnosed right knee pain; Type II diabetes mellitus; bilateral carpal tunnel syndrome; low back pain; psychiatric [*sic*]; obesity; acid reflux disease; and asthma.

---

[3]  The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR").  It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." *Id*. at 34.  The first description in the range indicates symptom severity; the second, level of functioning.  *Id*. at 32.  In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings.  *Id*. at 33.

       GAF 69 is at the top of the range GAF 61-70, which indicates "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*. at 34.

Stoltz opined on Plaintiff's functional capacity:

The patient's main medical issue centers around her musculoskeletal issues of her right knee and lower back pain.  Based on my objective findings, the patient would have no restrictions on sitting activities.  She could stand for short periods of time, probably 20-30 minutes at a stretch before she would have to take a short rest break.  She should be able to stand on her own but long distance walking might require the use of a cane at least.  She would be prohibited from going up and down steps or working at high places.  Lifting and carrying should be tolerable at 10 pounds.

AR 252.

**Psychiatric Review Technique.**  In an agency psychiatric review technique prepared for the agency on April 12, 2006, G.K. Ikawa identified adjustment disorder with depressed mood. This disorder resulted in mild limitations of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace.  Ikawa identified no episodes of decompensation.

**Residual Functional Capacity Assessment.**  Agency medical consultant R.D. Fast determined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; had unlimited ability to push or pull; and could occasionally climb, balance, stoop, kneel, crouch, and crawl.  Fast opined:

The claimant's allegations and contentions regarding the nature and severity of the impairment related symptoms, as well as functional limitations caused by these symptoms, are found to be not credible because they are not supported by appropriate medical findings and are inconsistent with the overall evidence in file. The limitations cited in this RFC assessment are found to be more consistent with the medical findings and the overall evidence than claimant's allegations.

AR 272.

**Vocational expert.**  Judith Najarian[4] classified Plaintiff's home care work and bus driving as medium and semiskilled.  For the first hypothetical question, the ALJ directed Najarian to assume an individual aged 38 to 42 with two years of college education and Plaintiff's work history.  The individual could lift and carry 20 pounds occasionally, ten pounds frequently; could stand, sit, and walk for six hours in an eight-hour workday; could sit at least six

[4] The transcript identifies Ms. Najarian as "Ms. Nigerian."

7

hours in an eight-hour workday; could occasionally climb, balance, squat, kneel, crouch, and crawl; needed to avoid concentrated exposure to fumes, dust, and temperature extremes; and was limited to simple one-, two-, and three-step job instructions.  Najarian opined that such an individual could not perform any of Plaintiff's prior relevant work.  Such a person could perform light unskilled jobs such as ticket taker (DOT No. 344.677-010; light; SVP 2) with 6,883 jobs in California; sales attendant (DOT No. 299.677-010; light; SVP 2) with 23,234 jobs in California; or fruit cutter on a line (DOT No. 521.687-066; light; SVP 1) with 4651 jobs in California.  For each of these three jobs, about nine times as many positions were available in the country as a whole.

The ALJ then directed Najarian to assume that, in addition to the attributes in the first hypothetical question, the individual's public contact was limited to occasional.  In that case, opined Najarian, the ticket person and the sales attendant would no longer be options.  A packing line worker (DOT No. 753.687-038; light; unskilled) would be an additional option but the available numbers (20,838 jobs in California) would have to be reduced by one-third to eliminate those positions that would require more frequent postural changes such as bending and stooping or that involve excessive exposure to fumes.   Finally, such an individual could be an assembler (DOT No. 706.687-010) with 33,788 positions in California.

The ALJ then directed Najarian to also assume that the individual described in hypothetical questions one and two was limited to occasional fine manipulation and frequent gross manipulation with both upper extremities.  According to Najarian, this change eliminated sixteen of twenty categories of assemblers.  The individual could still work as a polishing pad mounter (DOT No. 739.687-154) but the number of a assembly jobs would be reduced by eighty percent.  An additional available job would be a gold leaf products laborer (DOT No. 700.687-038), with 15,787 positions available in California.

For the fourth hypothetical question, the ALJ directed Najarian to assume an individual of the same age, education, and work history, who could lift and carry ten pounds occasionally and five pounds frequently; had no limitation of sitting; could stand or walk for twenty to thirty minutes before again needing to sit; and could only occasionally grasp and do gross handling.

1    Najarian opined that no job was were available for such an individual.  In so opining, Najarian

2    noted that she rejected the jobs of election worker and callout operator since both of those jobs

3    provided only infrequent, temporary work.  In response to the ALJ's question regarding the job

4    of surveillance system monitor, Najarian explained that, although the DOT identified that as a

5    possible position in this category, since the DOT had been promulgated, industry practice had

6    changed.  Currently, security workers rotate between surveillance and floor work as a means of

7    assisting the workers in maintaining concentration and focus during the surveillance periods.  As

8    a result, that job would be inappropriate for the hypothetical individual.

9    **II.    Discussion**

10        **A.    Scope of Review**

11       Congress has provided a limited scope of judicial review of the Commissioner's decision

12   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

13   a court must determine whether substantial evidence supports the Commissioner's decision.  42

14   U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v.*

15   *Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514

16   F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might

17   accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a

18   whole must be considered, weighing both the evidence that supports and the evidence that

19   detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

20   In weighing the evidence and making findings, the Commissioner must apply the proper legal

21   standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must

22   uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper

23   legal standards, and if the ALJ's findings are supported by substantial evidence.  *See Sanchez v.*

24   *Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

25       **B.    Legal Standards**

26       To qualify for benefits, a claimant must establish that he or she is unable to engage in

27   substantial gainful activity because of a medically determinable physical or mental impairment

28   which has lasted or can be expected to last for a continuous period of not less than twelve

9

months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental

impairment of such severity that he or she is not only unable to do his or her previous work, but

cannot, considering age, education, and work experience, engage in any other substantial gainful

work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir.

1989).

      To encourage uniformity in decision making, the Commissioner has promulgated

regulations prescribing a five-step sequential process for evaluating an alleged disability.  20

C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following

questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled. If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

      The ALJ found that Plaintiff had not engaged in substantial gainful activity since the

alleged onset date of April 14, 2004.  Her severe impairments included obesity, degenerative

lumbar disc disease, arthritis of the right knee, and carpal tunnel syndrome on the right.   The

ALJ concluded, however, that none of Plaintiff's impairments met or equaled an impairment

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Plaintiff was unable to perform her past

work as a home attendant and a school bus driver. She remained able to perform light work as

defined in 20 C.F.R. § 404.1567(b) and 416.967(b).

///

///

C.    **Improper Rejection of Stoltz's Opinion**

Plaintiff contends that the ALJ erred in rejecting the opinion of Dr. Stoltz, who actually examined her, in favor of the opinion of the agency physician who did not.  The Commissioner, who treats Stoltz's opinion as if he were a *treating* physician, replies that the ALJ did not err.

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ is "not bound by an expert medical opinion on the ultimate question of disability."  *Tomasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); Social Security Ruling 96-5p.  The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)."  *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician.  *Id.*  The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  In this case, no physician who treated Plaintiff offered an opinion regarding her ability to perform work.  Accordingly, the ALJ considered only opinions offered by examining (Wilson and Stoltz) and nonexamining (agency) physicians.

Once a court has considered the source of a medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory

11

1  opinions are in the record; and (2) clinical findings support the opinions.  The ALJ may reject the

2  uncontradicted opinion of a treating or examining medical physician only for clear and

3  convincing reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831.

4  Even though the treating physician's opinion is generally given greater weight, when it is

5  contradicted by an examining physician's opinion that is supported by different clinical findings

6  the ALJ may resolve the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  In the

7  absence of a treating physician's opinion, the same rule applies to the ALJ's evaluation of

8  opinions of examining and nonexamining physicians.  *Id.*  The ALJ must set forth a detailed and

9  thorough factual summary, address conflicting clinical evidence, interpret the evidence and make

10  a finding.  *Magallanes*, 881 F.2d at 751-55.  Without specific and legitimate reasons to reject the

11  opinion, the ALJ must defer to the treating or examining professional.  *Lester*, 81 F.3d at 830-31.

12  The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings.

13  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.  A general

14  statement that objective factors or the record as a whole are insufficient: the ALJ must tie the

15  objective factors or the record as a whole to the opinions and findings that he or she rejects.

16  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

17       The ALJ gave substantial weight to Family Care Provider's treatment notes, describing

18  them as giving a longitudinal picture of Plaintiff's impairments from August 2004 through June

19  2008, and as supporting a finding that they were managed by routine medication.  The ALJ also

20  gave weight to Sundaresan's examination findings to the extent that these reported that Plaintiff

21  demonstrated normal strength and reflexes, except for decreased handgrip strength.  He

22  discounted Sundaresan's report of significant sensory findings since the record did not establish

23  the degree of neurological deficit.

24       The ALJ also gave significant weight to Stoltz's examination findings but disregarded his

25  opinion regarding Plaintiff's functional capacity.  Describing the opinion as "overly restrictive,"

26  the ALJ explained that the examination reported an absence of back pain, a normal right knee

27  joint, and a normal range of movement in Plaintiff's wrists.  A review of Stoltz's opinion

28  supports the ALJ's determination.

1   Although Plaintiff arrived for the consultative examination supporting herself with a

2   walker and decked out in a soft knee brace and carpal tunnel braces for both hands, the

3   examination revealed that all movements of Plaintiff's neck, shoulders, elbows, wrists, hips,

4   knees, and ankles were within normal limits.  Her right knee had no crepitus or patellar

5   instability.  In contrast to his findings, Stoltz's opinion that Plaintiff's functional capacity

6   permitted only sedentary work appears to consistent with the ALJ's conclusion that it was overly

7   restrictive.

8       Except for Plaintiff's readily observable obesity, Stoltz's diagnoses (right knee pain, Type

9   II diabetes, bilateral carpal tunnel syndrome, low back pain, psychiatric; acid reflux disease, and

10  asthma) were based on Plaintiff's subjective reports or the unspecified medical records that

11  Stoltz reported reviewing prior to the examination.  In this regard, an evaluation of Stoltz's

12  opinion cannot ignore the ALJ's assessment that Plaintiff exaggerated the intensity, persistence

13  and limiting effects of her impairments.  This Court agrees that the medical evidence presented

14  does not indicate a present need for an assistive device for walking.  No evidence in the record

15  indicates that any of Plaintiff's physicians recommended use of a cane, walker, or orthopedic

16  braces.  In addition, Sundaresan noted that Plaintiff's claims that her pain medications did not

17  help her merited referral to a pain management specialist.

18      In short, substantial evidence supported the ALJ's determination, which was consistent

19  with applicable law.

20      **D.**     **Functional Effects of Carpal Tunnel Syndrome**

21      Plaintiff contends that the ALJ erred in finding that Plaintiff's bilateral carpal tunnel

22  syndrome constituted a severe impairment but not accounting for a severe hand impairment in his

23  determination of Plaintiff's residual functional capacity.  The Commissioner responds that the

24  ALJ was not required to assume unproven allegations that Plaintiff's carpal tunnel syndrome

25  affected her residual functional capacity.  This Court agrees.

26      Although Sundaresan opined that Plaintiff's sensory findings were consistent with carpal

27  tunnel syndrome or peripheral neuropathy, nothing in the record indicates that these initial

28  findings were followed up by additional testing to determine whether Plaintiff actually suffered

from peripheral neuropathy or carpal tunnel syndrome.  The record includes no radiology studies of Plaintiff's wrists, arms, or hands.  Neither Stoltz nor any other physician opined that the function of Plaintiff's hands was limited in any way.  In the absence of any evidence regarding Plaintiff's hand function, the ALJ properly did not consider Plaintiff to have any functional hand limitations.

**III.    Conclusion and Order**

The Court finds that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the Court hereby DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

**Dated:    September 11, 2011**                            **/s/ Sandra M. Snyder**
UNITED STATES MAGISTRATE JUDGE